IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMUNICATIONS TEST DESIGN, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> CONTEC LLC, <br><br> *Defendant.* | CIVIL ACTION <br> NO. 18-4077 |

**PAPPERT, J.**                                                                              February 15, 2019

**MEMORANDUM**

On September 21, 2018, Communications Test Design, Inc. filed this lawsuit against Contec LLC seeking declaratory judgments that its test systems do not infringe two Contec patents. Six days later, Contec sued CTDI for patent infringement in the Northern District of New York. Contec moves to dismiss CTDI's Complaint, arguing that CTDI acted in bad faith and engaged in forum shopping when it filed this lawsuit. Such conduct, according to Contec, warrants the Court's disregarding the case's "first-filed" status. In the alternative, Contec requests that the case be transferred to the Northern District of New York pursuant to 28 U.S.C. § 1404(a), or stayed pending the conclusion of that action. For the reasons that follow, the Court grants the Motion to Dismiss and declines to exercise jurisdiction over CTDI's declaratory judgment action in favor of Contec's patent infringement case.

I

CTDI is a global engineering, repair and logistics company that provides solutions and services to the communications industry. (Keith Montone Decl. ¶ 7, ECF

1

No. 11.)[1]  Since at least 2007, CTDI has developed, manufactured and used "Gen3" and "Gen5" test systems within the United States for testing set-top boxes and multimedia devices.  (Compl. ¶ 14, ECF No. 1.)  These test systems were designed and developed at CTDI's global headquarters in West Chester, Pennsylvania.  (Montone Decl. ¶¶ 8–9.)

Contec provides repair, test and reverse logistics for electronics hardware used in a broad range of markets.  (Hari Pillai Decl. ¶ 5, ECF No. 5-2.)  Contec is the owner by assignment of Patent Nos. 8,209,732 (the "'732 Patent") and 8,689,071 (the "'071 Patent").  (Compl. ¶¶ 1, 10.)  The '732 Patent relates to an "Arrangement and Method for Managing Testing and Repair of Set-Top Boxes," and the '071 Patent relates to a "Multimedia Device Test System."  (*Id.* at ¶¶ 8–13.)  Both patents were designed and developed at Contec's corporate headquarters in Schenectady, New York.  (Pillai Decl. ¶¶ 10–11.)

On September 6, 2017, Contec wrote to CTDI to determine whether CTDI's test systems infringed any claims of the '732 and '071 Patents.  (Compl. ¶ 15.)  Over the following year, CTDI and Contec, in an effort to resolve Contec's concerns, exchanged numerous emails and letters and held various telephone and in-person meetings and conferences.  (*Id.* at ¶ 16.)  In Contec's September 12, 2018 letter, counsel stated that "the parties' extrajudicial process for obtaining information about CTDI's systems, without the full discovery obligations that would be imposed during litigation, has

---

[1]  Since Contec's Motion to Dismiss raises a question as to whether the Court should retain or decline jurisdiction under 28 U.S.C. § 2201(a), the Court cites to the declarations and corresponding exhibits attached to Contec's Motion and CTDI's Response, which the parties rely on to support their respective positions.  *See Land v. Dollar,* 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion . . . the court may inquire, by affidavits or otherwise, into the facts as they exist.").

proved unsatisfactory." (*Id.* at ¶ 20; Ex. 7 to Coby S. Nixon Decl. at 2, ECF No. 5-13.) Counsel explained that it had "obtained or uncovered sufficient information about CTDI's systems to have a good faith basis for believing that CTDI infringes at least one claim of both the '732 Patent and '071 Patent." (Ex. 7 to Nixon Decl. at 2.) The letter requested a response from CTDI before the "close of business on September 19" as to whether it was willing to "discuss potential terms for a patent license agreement." (*Id.* at 3.) Otherwise, Contec would sue for patent infringement and, toward that end, attached to its letter a draft of its proposed complaint. (Compl. ¶ 20; Ex. 7 to Nixon Decl. at 3.)

On Wednesday afternoon, September 19, Jerry Parsons, CTDI's Chairman and CEO, spoke on the phone with Hari Pillai, Contec's CEO, about a possible license for Contec's patents. (Gerald Parsons Decl. ¶ 2, ECF No. 9; Pillai Decl. ¶¶ 23–24.) After Pillai proposed initial terms, the executives agreed to talk again on Monday, September 24, when Parsons indicated he would make a counterproposal. (Pillai Decl. ¶ 24.)[2] Following the call, Pillai emailed Parsons at 4:09 p.m. EST, stating he "look[ed] forward to [Parsons'] counter proposal [*sic*] to the per unit IP license fees. As discussed, let's connect by phone on Monday [September 24] afternoon . . . ." (Pillai Decl. ¶ 26; Ex. 1 to Pillai Decl., ECF No. 5-3.)

---

[2] Pillai claims that during the call he told Parsons that, "since CTDI was willing to discuss potential licensing terms, Pillai would instruct Contec's lawyers to stand down and refrain from filing a patent infringement complaint against CTDI in an effort to continue discussions." (Pillai Decl. ¶ 25.) Parsons, however, contends that "[a]t no time during that telephone discussion was mention made of directing lawyers to do or not do anything." (Parsons Decl. ¶ 4.) Whether or not Pillai said he would tell his lawyers not to file a lawsuit is immaterial to the Court's analysis, given Parsons' and CTDI's counsel's representations during and after the phone call.

3

At around 5:30 p.m. EST that day, CTDI's counsel emailed a letter in response to Contec's September 12 Letter. *See* (Mot. Dismiss at 7, ECF No. 5; Ex. 8 to Nixon Decl., ECF No. 5-14). Memorializing the discussion between Parsons and Pillai, counsel wrote "to express once again, that CTDI will consider potential terms as requested in your most recent letter . . . ." (Ex. 8 to Nixon Decl. at 1.) At the end of the letter, counsel reiterated that, "[d]espite our firm position on non-infringement and without admission, in an attempt to avoid an impasse, we remain willing to consider reasonable licensing terms and so, we encourage a continued conversation between the executives." (*Id.* at 3.)

On Friday, September 21, at 3:09 p.m. EST, CTDI filed its Complaint in this Court. (ECF No. 1.) At 3:36 p.m. EST, Parsons responded to Pillai's September 19 email: "As you know I am not interested in a per unit cost but will put a proposal together. 3:30 Pacific Time Monday [September 24] afternoon works for me." (Pillai Decl. ¶ 27; Ex. 2 to Pillai Decl., ECF No. 5-4.) There was no mention of CTDI's Complaint. (Ex. 2 to Pillai Decl.) Rather than send Mr. Pillai a proposal, CTDI sent Contec on September 24 a copy of the Complaint it filed three days before. (Nixon Decl. Ex. 9, ECF No. 5-15.) On September 27, Contec filed its complaint alleging patent infringement by CTDI.

II

A

The Declaratory Judgment Act provides in pertinent part:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

4

28 U.S.C. § 2201(a) (2000). The purpose of a declaratory action is to allow a party "who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." *Capo, Inc. v. Dioptics Med. Prod., Inc.*, 387 F.3d 1352, 1354–55 (Fed. Cir. 2004) (quoting *BP Chems. Ltd. V. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed Cir. 1993)). Courts exercise discretion in retaining or declining jurisdiction under the Declaratory Judgment Act. *See Minn. Min. & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed. Cir. 1991) ("[T]he very terms of the Act and its subsequent interpretation by the courts have made the exercise of declaratory judgment jurisdiction discretionary.").

Moreover, "[t]he field of patent litigation . . . is particularly adapted to declaratory resolution." *Capo*, 387 F.3d at 1347. Federal Circuit precedent controls such disputes because "[t]he proper relationship between an action under this act for a declaration of patent rights and a later-filed infringement suit triggers the Federal Circuit's special responsibility to foster national uniformity in patent practice." *Serco Servs. Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1038 (Fed. Cir. 1995); *see Futurewei Techs., Inc. v. Acacia Research Corp.*, 737 F.3d 704, 708 (Fed. Cir. 2013) ("Resolution of whether the second-file actions should proceed presents a question sufficiently tied to patent law that the question is governed by this circuit's law.")

B

Paralleling Article III of the Constitution, the Declaratory Judgment Act requires the existence of an actual controversy. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41 (1937). An actual controversy arises "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party,

5

and where that party contends that it has the right to engage in the accused activity without [a] license." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007). Neither party disputes that an actual controversy exists here. Contec told CTDI of its intention to sue in its September 12 Letter. (Compl. ¶ 20.) Contec maintains that CTDI's test systems infringe the '732 and '071 Patents and, as a result, a licensing agreement is necessary. (Mot. Dismiss at 1–9.) Although CTDI was in the midst of negotiating possible licensing terms, it argues that its test systems do not infringe Contec's patents and that it has a right to develop and manufacture these systems without a license. (Resp. Opp'n at 1–7, ECF No. 9); *see Sony Elecs. Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1286 (Fed. Cir. 2007) (ruling that an actual controversy existed where the patentee argued it was owed royalties based on the alleged infringer's activities but the alleged infringer contended it had a right to engage in those activities without a license).

C

1

The existence of an actual controversy exists does not, however, require courts to exercise jurisdiction over a declaratory action. *Wilton v. Seven Falls Co.,* 115 U.S. 277, 288 (1995). The Declaratory Judgment Act is "an enabling Act" that confers on courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* In describing the "unique breadth" of discretion, the Supreme Court explained that "[t]he statute's textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface." *Id.* at 286–

87. "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. Thus, as long as courts act in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, they can refuse to hear a declaratory judgment action. *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813–14 (Fed. Cir. 1996), *overruled in part on other grounds by Sony Elecs. Inc.*, 497 F.3d at 1283.

Discretion is not plenary, however, for a court "cannot decline to entertain [a declaratory judgment] action as a matter of whim or personal disinclination." *Public Affairs Assocs., Inc. v. Rickover,* 369 U.S. 111, 112 (1962); see *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993), *abrogated on other grounds by Wilton*, 515 U.S. at 115 ("Where there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal.") Nor can a court dismiss a declaratory judgment action merely because a parallel patent infringement suit was subsequently filed in another district; to take such action without any other reasons would be contrary to the general rule favoring the forum of the first-filed action. *Genentech*, 998 F.2d at 937. The "first-to-file" rule is "a doctrine of federal comity, intended to avoid conflicting decisions and promote judicial efficiency, that favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012) (citation omitted). Under the first-to-file rule, a district court may choose to stay, transfer, or dismiss a duplicative later-filed action. *Id.*

(citation omitted). The filing date of an action derives from the filing of the complaint. *See* Fed. R. Civ. P. 3.

CTDI filed this lawsuit on September 21, seeking declaratory judgments of non-infringement of the '732 and '071 Patents. *See* (ECF No. 1). Contec sued CTDI for patent infringement in the Northern District of New York six days later. *See Contec LLC v. Commc'ns Test Design, Inc.*, No. 1:18-cv-0011172 (N.D.N.Y.). Both actions involve the same parties (CTDI and Contec), the same patents (the '732 and '071), the same allegedly infringing products (CTDI's test systems) and the same issues (whether the test systems infringe any of the claims of the '732 and '071 Patents). Since the proceeding in the Northern District of New York is duplicative of the proceeding here, the Court can retain jurisdiction of this case under the first-to-file rule, subject to exceptions.

2

The first-filed action is preferred "unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise." *Genentech*, 998 F.2d at 937. The court's discretion "tempers the preference for the first-filed suit, when such preference should yield to the forum in which all interests are best served." *Id.* at 938 (citation omitted). Exceptions are "not rare" but the decision to decline to hear a properly brought declaratory action must rest on "sound reason that would make it unjust or inefficient to continue the first-filed action." *Id.* at 938 (citation omitted).

Contec argues that dismissal is warranted, in part, because CTDI's "preemptive filing, forum shopping and bad faith provide 'sound reason' why it would be unjust to

continue this first-filed action." (Mot. Dismiss at 15.) CTDI asserts that its filing was not anticipatory, and even if it was, that factor alone is not enough to depart from the first-to-file rule. (Resp. Opp'n at 9.) It further argues that its conduct does not indicate forum shopping or bad faith because there was "no real prospect for non-judicial resolution of their dispute." (Resp. Opp'n at 11.) The communications, both immediately before and after CTDI's filing, however, reveal its "nefarious motive" to anticipate Contec's impending suit and interfere with negotiations that Contec reasonably believed CTDI was conducting in good faith. *Sony Elecs. Inc.*, 497 at 1286. It would be unjust, and inconsistent with guidance from other courts, to honor the first-filed rule under the circumstances of this case.

After sending an initial letter warning the alleged infringer of its intention to sue, the patentee in *Serco Services Company, L.P. v. Kelley Co., Inc.* sent a second letter on September 8, setting September 20 as the deadline for the alleged infringer to cease and desist or face an infringement suit. No. CA 3:93-CV-1885, 1994 WL 715913, at *1 (N.D. Tex. May 24, 1994). On September 17, the alleged infringer filed a declaratory judgment action in the Northern District of Texas. *Id.* It responded to the patentee's letter on September 20, expressing that it had "taken necessary action in Texas" without elaborating upon what that meant. *Id.* Unaware that the alleged infringer had filed suit, the patentee filed its patent infringement suit on September 20 in the Eastern District of Wisconsin. *Id.* On appeal, the Federal Circuit affirmed the district court's classification of the declaratory action as "anticipatory," citing it as one factor in its decision to dismiss the suit in favor of the subsequent infringement action. *Serco Servs. Co.*, 51 F.3d at 1039.

9

Like the alleged infringer in *Serco Services Company* who beat the patentee in the "race to the courthouse," *id.* at 1039–40, CTDI filed suit in anticipation of Contec's impending infringement suit. On September 12, Contec sent CTDI a draft complaint attached to a letter giving CTDI until the "close of business on September 19" to notify Contec if it was willing to "discuss potential terms for a patent license agreement." (Compl. ¶ 20; Ex. 7 to Nixon Decl. at 3.) The letter also stated that Contec would otherwise be "forced to proceed with litigation." (Ex. 7 to Nixon Decl. at 3.) Armed with the knowledge that Contec intended to sue if the parties did not enter into a patent license, CTDI continued the pretense of good faith negotiations. On the day of Contec's deadline, September 19, Pillai and Parsons spoke on the phone about licensing terms. (Parsons Decl. ¶ 2; Pillai Decl. ¶¶ 23–24.) In fact, Pillai proposed initial terms, and the parties agreed to discuss Parson's anticipated counterproposal on Monday, September 24. (Pillai Decl. ¶ 24.) Following their call that day, Pillai sent Parsons an email at 4:09 p.m. EST, confirming the September 24 call. (Pillai Decl. ¶ 26; Ex. 1 to Pillai Decl.) About an hour later, CTDI's counsel wrote to Contec, "express[ing] once again, that CTDI will consider potential terms" and "encourage[ing] a continued conversation between the executives." (Ex. 8 to Nixon Decl.)

CTDI instead sued Contec Friday afternoon, September 21, at 3:09 p.m., something Parsons made no mention of in his response later that very day to Pillai's September 19 email. *See* (Pillai Decl. ¶ 27; Ex. 2 to Pillai Decl.). Neither did Parsons express "that terms for a licensing agreement would probably not be reached between Contec and CTDI," which he claims became apparent to him after his call with Pillai on September 19. (Parsons Decl. ¶ 8.) CTDI beat Contec to the courthouse by filing its

Complaint. *See* (ECF No. 1). Contec found out about the declaratory judgment action on September 24—the date Pillai and Parsons were supposed to discuss the proposals in more detail. (Pillai Decl. ¶ 26; Ex. 1 to Pillai Decl.)

The crux of CTDI's argument is that Parsons abruptly realized, on September 19, that the year-long negotiations would not be fruitful and that CTDI needed to move forward with its lawsuit and eradicate the "cloud" Contec's allegations created over CTDI's business, marketing activity and customer relations. (Resp. Opp'n 5–6; Parsons Decl. ¶¶ 8–9.) Unfortunately for CTDI, Parsons' agreement to continue negotiations the following week, his intention to offer a counterproposal and CTDI's counsel's letter promising a desire for a non-judicial resolution and continued negotiations contradict CTDI's position.

CTDI had every right, in its business and legal judgment, to break off negotiations and resort to litigation. What CTDI did not have the right to do, if it expected the Court to honor its first-filed Complaint, was to string Contec along just long enough to get the judicial drop and file this lawsuit in its own backyard. CTDI's conduct was inconsistent with the policy promoting extrajudicial dispute resolution, not to mention sound judicial administration and the conservation of judicial resources. It would be unjust to excuse this conduct with a rote adherence to the first-filed rule.

3

Although courts may consider "whether a party intended to preempt another's infringement suit," this is "merely one factor in the analysis." *Elecs. for Imaging v. Coyle*, 394 F.3d 1341, 1347–48 (Fed. Cir. 2005); *see Genentech*, 998 F.2d at 938 (reversing the district court's dismissal of a declaratory action because it was premised

11

solely on the fact that the suit was designed to anticipate a later-filed complaint in another forum). Interference with ongoing negotiations constitutes another "sound reason that would make it unjust" to exercise jurisdiction over the declaratory judgment action. The Federal Circuit in *EMC Corporation v. Norand Corporation* noted:

> [A] court may take into account the pendency of serious negotiations to sell or license a patent in determining to exercise jurisdiction over a declaratory judgment action. While a court may conclude that ongoing negotiations do not negate the presence of a controversy for jurisdictional purposes, the court may nonetheless find . . . that the need for judicial relief is not as compelling as in cases in which there is no real prospect of a non-judicial resolution of the dispute.

89 F.3d at 813–14, *overruled in part on other grounds by MedImmune, Inc., v. Genentech, Inc.*, 549 U.S. 118, 132 (2007). There, the district court's dismissal of the action was affirmed because the plaintiff filed its complaint as "a tactical measure to improve its posture in ongoing negotiations . . . [which was] not a purpose that the Declaratory Judgment Act was designed to serve." *Id.* at 814. The district court relied upon *Davox Corporation v. Digital Systems International, Inc.*, where the plaintiff filed suit while still engaged in negotiations with the patentee. 846 F. Supp. 144 (D. Mass. 1993). The *Davox* court felt that dismissal was proper because "it would be inappropriate to reward—and indeed abet—conduct which is inconsistent with the sound policy of promoting extrajudicial dispute resolution, and conservation of judicial resources." *Id.* at 148. The *EMC* court also cited to *NSI Corporation v. Showco, Inc.*, 843 F. Supp. 642, 645–46, (D. Or. 1994), where the plaintiff in a declaratory judgment action "took advantage of the fact that [trademark owner] had deferred the filing of expensive and probably protracted litigation because of its belief that settlement

12

negotiations were underway," and to *Bausch & Lomb Inc. v. Alcide Corporation,* 684 F. Supp. 1155, 1160 (W.D.N.Y. 1987), where the court dismissed a declaratory judgment action filed just after the defendant sent a letter offering to resolve the dispute without resorting to litigation because "[t]o allow this action to proceed would be to discourage such good faith effort to negotiate."

Parsons expressed an interest in negotiating a patent license both on the phone with Pillai on September 19 and in his response on September 21 to Pillai's September 19 email. (Parsons Decl. ¶ 2; Pillai Decl. ¶¶ 23–24; Ex. 2 to Pillai Decl.) CTDI's counsel also reassured Contec on September 19 of its desire to continue negotiations between the parties. (Ex. 8 to Nixon Decl.) CTDI took advantage of the fact that Contec deferred filing its complaint based on Contec's reasonable belief that licensing discussions were taking place in earnest, with the obvious hope that litigation would not be necessary.

Additional considerations supporting a court's decision to decline to exercise jurisdiction over a declaratory judgment action include "the convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest." *Genentech*, 998 F.2d at 938. (citation omitted). The Federal Circuit in *Serco Services Company* affirmed the district court's dismissal of the declaratory action because it considered the convenience of the parties in addition to the anticipatory nature of the suit:

> [A]ll of [the patentee's] witnesses were located in Wisconsin while [the alleged infringer's] were scattered throughout the country. Similarly, while some of [the alleged infringer's] documents were located at its Canadian headquarters, all of

13

>   [the patentee's] documents were located in Wisconsin. These factors support the
>   [district] court's decision to dismiss.

51 F.3d at 1040.

Similarly here, the various declarations submitted by the parties show that on balance the Northern District of New York is a more convenient forum to resolve the dispute between the parties. CTDI's global headquarters and principal place of business is in West Chester, Pennsylvania. (Montone Decl. ¶ 6.) CTDI alleges that many, if not most, of the CTDI witness with testimony relevant to Contec's infringement claims are located at the West Chester facility. (*Id.* at ¶ 14.) However, CTDI has over ninety facilities worldwide, including Glenville, New York, where its test systems have been used. (Resp. Opp'n at 2.) On the other hand, Contec's corporate headquarters are in Schenectady, New York. (Pillai Decl. ¶ 4.) Both Glenville and Schenectady are within the Northern District of New York and within reasonable proximity to Albany. Contec has no witnesses, physical facilities or place of business in Pennsylvania. (*Id.* at ¶ 22.) Its employee files for its current and former employees, its email server and its record databases are maintained in the Schenectady facility. (*Id.* at ¶ 20.) Three of the six inventors of the patents at issue are current residents of New York. (*Id.* at ¶ 13.) With respect to the absence of jurisdiction over necessary parties, five of these inventors, who would serve as key witnesses, are beyond the subpoena power of the Court. *See* Fed. R. Civ. P 45(c)(1).[3] Accordingly, these considerations support the Court's decision to dismiss the declaratory action in favor of Contec's later-

---

[3]     Darby Racey, an inventor on the '071 Patent, left Contec in 2012 and is a consultant in the greater Albany area. (Pillai Decl. ¶ 15.) Mark Albrect, an inventor on the '732 Patent, left Contec in 2014 and works in CTDI's Glenville facility. (*Id.* at ¶ 16.) Vicente Miranda, Rong Le and Luis Aguilar are former Contec employees and reside in Georgia, Washington D.C. and Canada, respectively. (*Id.* at ¶¶ 17–19.)

14

filed infringement action, where CTDI is free to defend that its test systems do not infringe Contec's patents. The Court obviously need not address Contec's alternative requests to transfer or stay the case.

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***

GERALD J. PAPPERT, J.